**James SMITH, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

**No. 43, 2006.**

Supreme Court of Delaware.

Submitted: Nov. 29, 2006.
Decided: Feb. 16, 2007.

---

**22.** *United States v. Peppers,* 302 F.3d 120, 127 (3rd Cir.2002).

**23.** *McKaskle v. Wiggins,* 465 U.S. 168, 177 n. 8, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984).

F. Phillip Renzulli, Office of the Public Defender, Wilmington, DE, for Appellant.

John R. Williams, Department of Justice, Dover, DE, for Appellee.

Before HOLLAND, BERGER, JACOBS and RIDGELY, Justices, and NOBLE, Vice Chancellor,[1] constituting the Court en Banc.

1. Sitting by designation pursuant to Art. IV, § 12 of the Delaware Constitution and Supreme Court Rules 2 and 4.

BERGER, Justice:

In this appeal, we consider whether a statement given to the police by a mildly mentally retarded juvenile was admissible at his delinquency trial. After viewing a portion of the videotaped statement and hearing testimony from the police officer and others, the Family Court concluded that the juvenile knowingly and voluntarily waived his *Miranda* rights. On review, we adhere to the totality of the circumstances test, but we consider the juvenile's mental limitations and the fact that his mother was not with him during the interview as significant factors. Having viewed the videotaped statement, and considering all of the circumstances, we conclude that the juvenile's waiver was not knowing. We therefore reverse and remand the case for a new trial.

### Factual and Procedural Background

The incidents that gave rise to this delinquency proceeding took place on September 20, 2003. Rita Smith[2] took her children, James and Cheryl, to visit her sister, Mary Hawn, and Mary's daughter, Georgia Gallo. At that time James was 14 years old and Georgia was three. According to Georgia, at some time during that day, she was in the bathroom with James and he told her to "lick his wee-wee." Later that day, while they were playing frisbee, they went behind a shed and he again demanded that she perform fellatio. Georgia reported what happened to her mother, who immediately sought assistance from her family physician and the authorities. Georgia was examined at the A.I. duPont Hospital. Although the examining physician found no physical evidence of sexual contact, he opined that Georgia had been abused based on her spontaneous statements in the waiting room and in the examining room. In October, 2003 Terri Kaiser, a forensic interviewer from The

Children's House interviewed Georgia about the events in question. Georgia repeated her earlier statements and also said that James touched her "wee-wee" and her behind.

Detective Jason Atallian, of the New Castle County Police Department, went to the motel where James and his family were living on December 19, 2003. Rita answered the door and told Atallian that her son was asleep, having stayed home from school for the past two days because of a cold. Atallian told Rita that he wanted to talk to James and that she should call to schedule the interview. As Atallian was returning to his car, however, Rita called out and told him that James was awake and that they would come to the station right then. Rita and James followed Atallian to the station in their own car.

There is some dispute as to exactly what was said before Atallian took James into the interrogation room. Atallian testified that he told Rita that James was a suspect in a criminal investigation involving sexual misconduct; that Rita could be present while he questioned James; and that she could have a lawyer present during the questioning. Rita testified that Atallian refused to tell her what the investigation was about; told her she could not be with her son; and never mentioned a lawyer prior to the questioning. The trial court accepted Atallian's version of the facts.

Atallian questioned James for approximately 45 minutes. At the outset, Atallian asked James whether he could read and write. James said he had trouble with reading. Atallian said that he would read the rights to James and that James could stop him and ask questions. Atallian then stated:

**2.** Pursuant to Supreme Court Rule 7(d) all family members have been given pseudonyms.

Okay number one you have the right to remain silent. And what that means is you can be quiet if you want to. You don't have to answer anything if you don't want to. Anything you say can and will be used against you in a Court of law. It just means whatever we're talking about today you know is legal, you know whether it happens from here on out whatever we talk about you know is pertinent to what's going to happen okay. You have the right to talk to a lawyer and have him present with you while you're being questioned. If you can't afford to hire a lawyer one will be appointed to represent you. If you wish one we've already talked to your mom about that and that's fine. At any time during this interview if you wish to discontinue your statement you have the right to do so. All that means is at any time we're talking if you want to talk to me or you don't. You understand these things I explained to you?

James answered, "Uh Uh" and then wrote his name in the appropriate space on the form (he could not sign his name because he did not know how to write in cursive).

During the questioning, Atallian repeatedly told James that he knew what had happened, but that he had to hear it from James so Atallian would be able to help James. Frequently, after Atallian's questions, James gave no response. He simply sat silently, bent over, looking at the floor. After many attempts to get James to open up, and another period of silence, Atallian said, "I'm not going anywhere. The only way we're walking out of here is if you're straight up and honest with me and we deal with this and then I can help you." During the course of the interrogation, James confessed to several of the sexual encounters Georgia described. At the end of the interrogation, Atallian explained to James, and then his mother, that James was going to be arrested for sexual crimes.

Prior to trial, James moved to suppress the statement, arguing that his waiver of *Miranda* rights was not knowing and voluntary. After a hearing, the trial court acknowledged that James was a special education student with reading problems. Nonetheless, the court denied the motion, finding that the rights were read to him in "simple language" and that there was no indication that James did not understand them. Several months later, James filed a motion to determine his competency to stand trial.

At the competency hearing, Dr. Abraham Mensch, a psychologist supervisor with the Delaware Division of Child Mental Health Services, was the only witness. Mensch testified that James was identified as a special needs child at the age of three. James has a full scale IQ of 67, which is in the mild mental retardation range, and his word recognition and arithmetic skills are equivalent to second grade, which is extremely low. In his 12 page report, Mensch concluded:

> In summary, at the time of this evaluation, as a result of mental defects involving impaired neurocognitive functions, [James] presents with significant impediments to his ability to proceed to trial, including: (1) to consult with defense counsel rationally, (2) to assist in preparing his defense, and (3) to have both a rational and factual understanding of the proceedings against him.

> [James], in spite of specific significant deficits, possesses some of the skills/abilities related to competency to proceed to trial. He understands that he faces "criminal" charges, and can relate the date and basic elements of his offenses. He is likely able to establish rapport with his attorney, but his intellectual deficits set limits on the functionality of this rapport.

Although there are also difficulties with the accurate understanding of the roles of some of the participants in the courtroom, these can be taught to [James], and this does not constitute a significant impediment to adjudicative competency. The most serious impediments to the capacity to proceed to trial involve significant deficits in the cognitive abilities necessary to consult with his attorney, follow testimony reasonably well, and testify in his behalf, if necessary.[3]

The trial court decided that, despite his limitations, James was competent to understand the proceedings, assist his attorney, and give evidence in his own defense. In recognition of Mensch's findings, however, the trial court agreed to schedule additional time for the trial to allow James and his counsel to review the proceedings slowly.

At trial, the State relied primarily on Georgia's testimony and James's videotaped statement. James did not testify. His only witness was his sister, who testified that she was at Mary's house most of the day and that Georgia and James were not together, alone. The trial court found James delinquent on two counts of second degree rape and one count of second degree unlawful sexual contact. In reaching that decision, the trial court relied primarily on the admissions in James's videotaped statement and Georgia's testimony.

## Discussion

 James first argues that the trial court erred in finding him competent to stand trial. The applicable legal standards are settled:

Juveniles in delinquency proceedings are entitled to the same essential and fundamental due process rights as adult criminal defendants. The prosecution bears the burden of proving a defendant's legal competency by a preponderance of the evidence. The test for competency is set forth in 11 *Del. C.* § 404(a), which provides in relevant part:

Whenever the court is satisfied, after hearing, that an accused person, because of mental illness or mental defect, is unable to understand the nature of the proceedings against the accused, or to give evidence in the accused's own defense or to instruct counsel on the accused's own behalf, the court may order the accused person to be confined and treated in the Delaware Psychiatric Center until the accused person is capable of standing trail.

Put another way, "the test of legal competency ... is ... [w]hether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him." The United States Supreme Court has also added the requirement that a defendant be able to "assist in preparing his defense."

When the Family Court decides a juvenile's competency to stand trial, that determination is entitled to deference by this Court.[4]

James points out that he is mildly mentally retarded and that, according to Mensch, he has "significant cognitive and language deficits that might interfere with his ability to testify relevantly, and to recognize self-injurious statements."[5] More-

---

**3.** Psychological Evaluation for Competency, dated 12/8/04, at 10–11.

**4.** *Randolph v. State,* 2005 WL 1653635 at *1–2 (Del.Supr.) (Citations omitted.)

**5.** *State v. JS,* Incident No. 0312013339, Psychological Evaluation for Competency at 8, Defense Exhibit # 2, March 8, 2005 Competency Hearing.

over, Mensch testified that James cannot be relied upon to respond accurately to the question, "Do you understand?" because he cannot always recognize what it is that he does not understand. Based on the evidence of these and other related limitations in his ability to process information and communicate, James contends that the trial court abused its discretion in finding him competent to stand trial.

The trial court, relying on Mensch's testimony and report, concluded that James could understand the proceedings, give evidence in his own defense, and assist and consult with his attorney "with a reasonable degree of rational understanding." [6] That conclusion is supported by Mensch's testimony that: (1) James understood that he was charged with a crime and knew when the events took place and who was involved; (2) James knew that his attorney was there to help him and that there was someone on the "other side" who was not; and (3) James has a "rudimentary" ability to tell his attorney facts about the offenses. In addition, the trial court made accommodations for James's limitations by agreeing to proceed slowly and to allow multiple recesses. Because the trial court's decision was supported by the record and not unreasonable, we find no abuse of discretion and affirm the competency determination.

▮▮▮ We reach a different conclusion, however, with respect to the trial court's denial of James's suppression motion. The State has the burden of proving, by a preponderance of the evidence, that James knowingly and voluntarily waived his *Miranda* [7] rights:

The general requirements for a suspect's waiver of his *Miranda* rights under the Fifth Amendment prior to in-custody interrogation are well established. "[A] suspect may waive his Fifth Amendment privilege, 'provided the waiver is made voluntarily, knowingly and intelligently' " .... The question of whether an accused has waived his rights "is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." This determination must ... be made under a "totality of the circumstances" inquiry. A judicial inquiry into a valid waiver ... has "two distinct dimensions":

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.[8]

▮▮▮ Juvenile confessions "require special scrutiny." [9] Thus, in deciding whether a juvenile's waiver is valid, the "totality of the circumstances" standard requires "evaluation of the juvenile's age, experience, education, background, and intelligence, and ... whether he has the capacity to understand the warnings given to him, the nature of his ... rights, and the consequences of waiving those rights." [10] This Court has expressly rejected the so-called "interested adult"

**6.** *State v. JS,* 2005 WL 3507990 at *7 (Del. Fam.Ct.).

**7.** *Miranda v. Arizona,* 384 U.S. 436, 466, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**8.** *Marine v. State,* 607 A.2d 1185, 1195 (Del. 1992) (Citations omitted.).

**9.** *Haug v. State,* 406 A.2d 38, 43 (Del.1979).

**10.** *Fare v. Michael C.,* 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979).

rule—the contention that a juvenile cannot waive his rights without first being given the opportunity to consult with a parent or other interested adult.[11] But, the lack of guidance from an interested adult certainly is a factor in the "totality of circumstances." And, it is an important factor if, in addition, the juvenile suffers from diminished mental capacity.

In ruling on James's motion to suppress, the trial court made several findings. Based on credibility, the trial court found that: (1) Atallian told James's mother that James was a suspect in a criminal investigation involving sexual behavior; and (2) Atallian also told James's mother generally about James's *Miranda* rights. From watching the videotape, the trial court found that:

> [James] was presented with the Miranda warnings in a way that he could know it. It's clear he had some problem reading. I'm not sure how much of that is real or how much that was, what the creditability of that is today. But even if I were to believe he could not read those statements today and maybe he might not have understood that language as they are written when I heard Officer Atallian on each one I thought translated in very plain language.... I don't know how [James] could not understand that.... [T]here's no indication to me that [James] couldn't hear and understand the simple language that Officer Atallian ... went through each of those rights.[12]

When the trial court ruled on the motion to suppress, the court did not have the benefit of Mensch's competency evaluation. In fact, after Mensch testified, the trial court noted that, "probably if I re-heard that (the suppression motion) today would

have required much more detailed explanation of the Miranda rights than I saw today. But that's water over the dam." [13]

This Court has viewed the videotape with the added perspective that the trial court lacked. As a result, we know that there was no credibility issue about James's inability to read or understand the "standard" *Miranda* warnings. His word recognition skills were those of a second grader. In addition, Atallian's simplification of the *Miranda* warnings was not as clear and understandable as the trial court suggested. For example, in explaining that James's statements will be used against him, Atallian said, "It just means whatever we're talking about today you know is legal, you know *whether it happens from here on out whatever we talk about you know is pertinent to what's going to happen today.*" The italicized portion of that "explanation" is almost unintelligible. The same is true for Atallian's explanation of James's right to "discontinue [his] statement." Atallian explained, "All that means is at any time we're talking *if you want to talk to me or you don't.*"

Atallian's explanation of James's right to an attorney was particularly troublesome. He told James, "If you wish one (an attorney) we've already talked to your mom about that and that's fine." The simplest meaning of that message is, "Your mother took care of that for you." The trial court discounted Atallian's comment because James testified during the suppression hearing and did not say that he thought his mother had waived his right to an attorney. The trial court noted, "I heard him say it didn't mean anything to him. He didn't feel pressured by the fact that his mother said that." [14] Again, with the perspective of Mensch's report, the trial

---

11. *Haug v. State,* 406 A.2d at 43.

12. Appellant's Appendix, A–122–23.

13. Appellant's Appendix, A–216.

14. Appellant's Appendix, A–124.

court's first statement undoubtedly is correct—the right to an attorney, and the right to have one appointed for you, "didn't mean anything" to James.

The remainder of the videotape adds to our concern about James's understanding of his rights. He was told at the outset that he could "be quiet" if he wanted to and that he did not have to answer anything. When Atallian asked James to come clean and tell him what really happened, James repeatedly responded by being quiet—not answering. To the extent that James understood the first, and arguably simplest, of the *Miranda* warnings, the videotape strongly suggests that he was trying to do what he was told he could do, by remaining silent. We do not hold that James's silence in response to numerous questions constituted an invocation of his right to terminate the interrogation. Rather, we find his repeated silences to be evidence of his limited and inadequate understanding of his rights.

This is a boy who, according to Mensch, could not be counted on to understand the limits of his own understanding. He was 14 years old, but was functioning at a second grade level. He could not read the *Miranda* warnings himself, so was given a quick and confusing explanation of what they supposedly meant. He could not sign his name because he did not know how. His mother was not with him during the interview. He had never been involved with the police before that interrogation. The totality of these circumstances compels the conclusion that James's waiver of his *Miranda* rights was not knowing. Accordingly, we must reverse the trial court's denial of his motion to suppress and remand for a new trial.

### Conclusion

Based on the foregoing, the Family Court's judgment of delinquency is RE-VERSED and this matter is remanded for a new trial. Jurisdiction is not retained.