Andrew BROWN, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 485, 2006.

Supreme Court of Delaware.

Submitted: Oct. 9, 2007.
Decided: Dec. 17, 2007.

Jerome M. Capone, Law Office of Jerome M. Capone, Wilmington, DE, for appellant.

Timothy J. Donovan, Jr., Department of Justice, Wilmington, DE, for appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the court en banc.

STEELE, Chief Justice:

Defendant-appellant, Andrew Brown, confessed that he murdered Steven Cleveland to New York Police Department officers (the "NYPD statement"). Brown confessed while NYPD officers transported him between stations in Brooklyn, New York after an unconstitutional interrogation by Wilmington police officers. At trial, Brown moved to suppress the initial interrogation conducted by the Wilmington police officers based on violations of the *Fifth* and *Sixth Amendments,* which the State conceded. Brown further sought suppression of the later NYPD statement as "fruit" of the unconstitutional interrogation. The State opposed that application.

■ Under *Sixth Amendment* jurisprudence, a statement obtained after a defendant invokes his right to counsel cannot be admitted if the police "deliberately elicited" it. At the suppression hearing, the Superior Court judge admitted the NYPD statement. The trial judge, though, only considered whether Brown made the statement in response to a police interrogation. The trial judge believed that the evidence demonstrated that the interrogation had ended for the purposes of the *Fifth Amendment.* Because the trial judge failed to consider whether the police "deliberately elicited" Brown's statement under the *Sixth Amendment,* we must **REMAND** for a further factual inquiry about the statement's admissibility.

Brown argues that the trial judge made two additional reversible errors at trial. Brown contends, first, that the trial judge improperly admitted two videotaped statements; and, second, that the trial judge should have ordered a mistrial after the State failed to release a transcript of an interview with one of the State's witnesses until after that witness testified. We discuss those arguments at the end of this opinion. However, because we find no error, we **AFFIRM** those rulings.

## FACTS AND PROCEDURAL HISTORY

Steven Cleveland was shot and killed in Wilmington in March 2005. On the night of the shooting, Steven and Dion Gibbs walked back to Steven's house after visiting some friends. When they turned the corner at Kirkwood Street, three men attacked Steven and Dion. One of the attackers held a gun to Dion's head and rummaged through his clothing, looking for valuables. The attacker demanded that Dion remove his clothes and ordered him to run away, leaving Steven behind. As Dion ran away, he heard gun shots. The attacker shot Steven four times. Steven died from massive internal bleeding.

The Wilmington Police (WPD) investigated the homicide. They eventually determined that Andrew Brown killed Steven. A Grand Jury indicted Brown on first degree murder and eight other related charges. However, the police could not find Brown.

The search for Brown continued for several months. Eventually a joint task force of Federal Marshals and the NYPD found and arrested 17 year-old Brown in Brooklyn, New York. After the officers arrested Brown, they contacted the WPD, and the chief investigating officer for the case, Detective Donna DiClemente, went to New York.

DiClemente and Detective Bower, also a Wilmington police officer, interrogated Brown at the police station in Brooklyn without any involvement from and outside the presence of NYPD officers. After the WPD interrogation, Brown made an incriminating statement to NYPD officers as they transported him from the interrogation to the central booking station in New York. Brown told NYPD officers:

> She [DiClemente] stated that the reason I shot Steven Cleveland was because he wouldn't do what I wanted him to do. She doesn't know what she is talking about. That's not why I shot him. If you were there and looked at his body, you would have seen he was doing exactly what I wanted him to do, taking off his clothes, as you can see his pants were down to his knees when they found him. I shot him because he wasn't doing it fast enough.

Before trial, Brown sought to have both the interrogation and the later statement to the NYPD officers suppressed. At the suppression hearing, the State conceded the impropriety of the first interrogation but still sought to introduce the NYPD statement. The trial judge admitted the NYPD statement after a bench ruling focusing solely on a *Fifth Amendment* analysis.

Brown appeals the trial judge's decision admitting the statement. In order to assess Brown's suppression argument, we set out the relevant facts about the initial unconstitutional interrogation to determine the relative impact of that interrogation on the admissibility of the later NYPD statement. We then follow with a review of the NYPD statement. Finally, we discuss the trial judge's bench ruling admitting the statement.

### The Interrogation

After reviewing the record, we have encountered some difficulty determining what exactly happened at the initial interrogation. Our difficulty stems from two critical decisions made at the suppression hearing. First, the State conceded that the interrogation violated Brown's constitutional rights. That concession obviated any need to review the interrogation to determine its admissibility.[1] Second, the trial judge admitted the NYPD statement without a thorough review or fact findings on the initial interrogation.[2]

The record before us today is, therefore, limited to the transcript of the interrogation without any additional fact findings.[3] From this cold transcript, we cannot possibly draw any significant factual conclusions or inferences from the events and circumstances surrounding the interroga-

1. When the State conceded the suppression of the interrogation, it did not clearly indicate what constitutional norm it violated at the interrogation. The violation could have been a *Fifth Amendment Miranda* violation, or it could have been a *Sixth Amendment* violation because Brown had already been indicted. The State now concedes on appeal that, in addition to any potential *Fifth Amendment Miranda* violation, it violated Brown's *Sixth Amendment* rights. We note that our analysis, today, focuses on the interrogation as a violation of the *Sixth Amendment*.

2. The trial judge indicated that "if I'm going to have to get into exactly what happened

during that interview, I'm going to have to have more evidence in front of me." However, the trial judge did not seek nor did either party produce additional evidence about the interrogation.

3. The trial judge partly based her ruling on the fact that Brown had been advised of his *Miranda* rights. We do not believe that this finding of fact was "sufficiently supported by the record" before the trial judge, *Wright v. State* 633 A.2d 329, 333 (Del.1993), because of inconsistencies in the transcript of the interrogation. This fact finding must be reevaluated after a more thorough review of the circumstances surrounding the interrogation.

tion without a more elaborate factual record. We do believe, however, that the record sheds light on a few key factors and discrepancies in the record that weigh against the admissibility of Brown's NYPD statement.

After the police officers first recited the *Miranda* warnings, Brown, an indicted juvenile, responded "I ain't talking about nothing now, hell no" and then made some additional statements. But instead of ending their questions, the police officers continued. The officers then reread the *Miranda* warnings individually, seeking Brown's acknowledgment of each right. First, the officers told Brown that he had the right to remain silent. Brown indicated that he was a minor and that his "parents might have." But according to the transcript, the officers apparently cut him off and asked "Do you understand that?" Brown responded that he understood, but it is not apparent what he, in fact, understood.

The officers continued saying that "[a]ny thing you say can and will be used against you in a court of law, do you understand that?" Brown answered, "Yes if you got it on tape." The officers replied, "Okay. You have the right to talk to a lawyer." Brown acknowledged that right. The officers explained the remaining rights, which Brown also acknowledged. The officers asked Brown if he wanted to talk. Brown responded that he would *not* talk about the incident in March that he read about in the papers.

Nevertheless, the interrogation continued. DiClemente told Brown that she would recite the *Miranda* warnings again. Brown retorted, "You read them twice!" The officers responded "I understand that, but you said I don't want to talk to you and now you want to talk to your lawyer." Brown repeated "No, I ain't talking to you, no."

From this point on, the ensuing events become muddled because the transcript shows that the tape stopped and suddenly, without any indication about the extent of lapsed time, the officers said "Alright Andrew, you expressed that you wanted to talk to us again, I'm going to read your rights again." But, neither the tape nor any other evidence explained Brown's radical reversal in course or what exactly occurred after the tape stopped and before it resumed.

After the officers read Brown his rights again, they asked him to repeat the rights back to them. DiClemente asked, "In your words what does that [*i.e.* his rights] mean?" Andrew responded, "It means I'm willing to talk to [the officers] all about the crime that you all accusing me of." The officers asked Brown, "Do you know that you don't have to talk to us right now?" Andrew answered "I know that."

During the interview Brown made some potentially incriminating statements but flatly denied shooting Steven. The record fails to show the length of the interview, but the parties estimate that it may have lasted up to two hours. At the end of the interview the officers attempt to establish Brown's motive by saying that "[Steven] embarrassed you first and you tried to embarrass him." Brown says "that ain't the same dude." Then one of the officers repeats the question, suddenly *someone* (unidentified) yells "I'm done!" and the interview ends.

### The NYPD Statement

A short but otherwise indefinite period of time elapsed after the interview concluded and before two NYPD officers drove Brown from the Brooklyn station to Central Booking. While the NYPD transported Brown during a five to ten minute car ride, Brown made his incriminating statement. The trial judge found that the

NYPD officers did not engage Brown or attempt to solicit any statement and that these officers were unaware of any of the facts surrounding the case. The record supports each of those findings.

### The Suppression Hearing

The State initially sought to introduce both the interview and the NYPD statement. Brown moved to suppress both statements. The State did not oppose suppressing the initial interview. The State, however, argued that Brown's comments to the NYPD should be admitted. During the suppression hearing, the trial judge stated:

Well I don't think—I mean, if I'm going to have to get into exactly what happened during that interview, I'm going to have to have more evidence in front of me. What I'm going to decide on is whether or not the suppressed statement is sufficiently removed in time, place, identity of person to—so that the taint is removed from the fruit of the poisonous tree. I can tell you now that I do find that the testimony of the two police officers is consistent and credible. And for purposes of this motion, I find that this was not a custodial interrogation. And I find that neither officer said anything which resulted in the statement which was made by the defendant. So that's my ruling with regard to that issue. So now the question becomes whether or not his statement is part of a continuum of an otherwise prohibited interview.

A few minutes later the trial judge held: Well I don't think that the case law that has been presented to me is going to resolve this issue one way or another. I think it is a factual question as to whether or not there's been a sufficient separation between the interview and the unsolicited utterance. As I already said, I do find that the statement was not

made as part of any interrogation, custodial or otherwise. I credit the testimony of the two officers when they stated that they did not say anything to the defendant. I'm not going to suppress the statement. I'm going to deny that motion for several reasons. First of all, I find that what the defendant commented on was what Detective DiClemente told the defendant and not to clarify what the defendant had told Detective DiClemente. Therefore, even—it was not part of a clarification of any statement that the defendant made at the interrogation, which was suppressed. I also find that although the time between the interrogation and the statement is relatively short, I think all the parties testified that it was within the range of about five to ten minutes. The interrogating detectives had left, it was two different officers, the defendant was not only removed from the building, but was being transported. It would be clear to any reasonable person that the interrogation had ceased. There's no evidence of coercion at the time the statement was made. Indeed, both officers who were in the car testified that they were unaware of the content of the interview' and, in fact, the New York Police Department detective testified that he—I should say both testified that they, under their own procedures, would not have conducted an interrogation at that point, but rather would have preferred to have it under more optimal circumstances in police headquarters. The fact that the defendant was a juvenile at the time does not affect my ruling. I do find that the age of the defendant is relevant. He was 17. He had obviously had some contact with the criminal justice system. He, himself, stated that he did not like cops. Obviously, he has had some experience with police officers, and for—and he also had been advised of his rights, although the police did continue

to interrogate after that. So that factor, I think, is a natural factor, the fact that he had been made [sic] his *Miranda* rights. But I find that not to be dispositive because this was an unsolicited utterance.

Trial followed, and the jury found Brown guilty on every count.

## DISCUSSION

We must address what appropriate legal standard should be applied to determine whether to admit the NYPD statement. The trial judge believed that the NYPD statement is admissible and rested her decision on a factual determination that the NYPD officers did not obtain Brown's statement in response to interrogation. We review the trial judge's formulation of the appropriate constitutional legal standard *de novo*.[4]

■ Delaware law, if not United States constitutional law, applies "special scrutiny" to any confessions and incriminating statements made by juveniles.[5] We have continually reaffirmed the need for "special scrutiny" of juvenile's statements and reaffirm that process today.[6]

■ The *Sixth Amendment* provides "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence."[7] "The *Sixth Amendment* right to counsel is triggered at or after the time that judicial proceedings have been initiated whether by way of formal charge, preliminary hearing, indictment, information, or arraignment."[8]

■ Specifically, the United States Supreme Court has held that the state violates the *Sixth Amendment* when it uses a defendant's own incriminating words " 'deliberately elicited from him after he had been indicted and in the absence of his counsel.' "[9] A suspect, "having expressed his desire to deal with the police only through counsel, [cannot be] subject[ed] to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."[10] "[T]he reasons for prohibiting the interrogation of an uncounseled prisoner who has asked for the help of a lawyer are even stronger after he has been formally charged with an offense than before."[11] "[A]fter a formal accusation has been made—and a person who had previously been just a 'suspect' has become an 'accused' within the meaning of the *Sixth*

4. *See Stigars v. State*, 674 A.2d 477, 481 (Del. 1996) (reviewing an alleged Constitutional violation *de novo*).

5. *Haug v. State*, 406 A.2d 38, 43 (Del.1979).

6. *See Smith v. State*, 918 A.2d 1144, 1150 (Del.2007); *Brown v. State*, 1991 Del. LEXIS 372 (Del.1991); *Marine v. State*, 607 A.2d 1185, 1197 (Del.1992); *Blankenship v. State*, 447 A.2d 428, 431 (Del.1982).

7. U.S. Const. amend. VI. Applied to the states through the Fourteenth Amendment. *See Gideon v. Wainwright*, 372 U.S. 335, 342–43, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

8. *Fellers v. United States*, 540 U.S. 519, 523, 124 S.Ct. 1019, 157 L.Ed.2d 1016 (2004) (quoting *Brewer v. Williams*, 430 U.S. 387,

398, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972)) (internal quotations omitted); *Alston v. State*, 554 A.2d 304, 308 (Del.1989).

9. *Fellers*, 540 U.S. at 523, 124 S.Ct. 1019 (quoting *Massiah v. U.S.*, 377 U.S. 201, 206, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964)).

10. *Michigan v. Jackson*, 475 U.S. 625, 626, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986) (quoting *Edwards v. Arizona*, 451 U.S. 477, 485, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)).

11. *Id.* at 631, 106 S.Ct. 1404.

*Amendment*—the constitutional right to the assistance of counsel is of such importance that the police may no longer employ techniques for eliciting information from an uncounseled defendant that might have been entirely proper at an earlier stage of their investigation."[12] "Once the right to counsel has attached and been asserted, the State must of course honor it. This means more than simply that the State cannot prevent the accused from obtaining the assistance of counsel. The *Sixth Amendment* also imposes on the State an affirmative obligation to respect and preserve the accused's choice to seek this assistance."[13]

The State conceded that the original interrogation violated Brown's constitutional rights. The State now admits, and we recognize, that it violated Brown's *Sixth Amendment* right to counsel because Brown had already been indicted when the police arrested and interrogated him. The State contends that the NYPD statement should not be suppressed because it was a voluntary statement made without any taint of the earlier *Sixth Amendment* violation—*i.e.*, in the words commonly found in *Sixth Amendment* analysis—Brown initiated his statement to the NYPD. The State maintains the burden of proving "an intentional relinquishment or abandonment of a known right or privilege."[14]

The trial judge found that Brown made an unsolicited utterance, and admitted the statement into evidence. After reviewing the trial judge's bench ruling, we find it plainly evident that the transcript of the interrogation was the only evidence that the trial judge considered to support her finding that Brown made an unsolicited utterance. The trial judge's analysis appears to consider the earlier interrogation a violation of *Miranda* and the *Fifth Amendment*, because the trial judge refers to the fact that the police mirandized Brown and then focused on whether the statement was a continuation of the interrogation. These are critical issues for violations of the *Fifth Amendment*—but not the *Sixth Amendment*. Thus, the trial judge apparently never conducted a *Sixth Amendment* violation analysis.

■ Under the *Sixth Amendment*, if Brown invoked his right to counsel, the police could not use any of his later statements after the police initiated contact even if Brown purportedly later waived those rights.[15] Brown's *Sixth Amendment* right to counsel undoubtedly attached upon indictment, and Brown may have invoked his right to counsel. The transcript shows that DiClemente believed that at some point Brown invoked his right to counsel. After DiClemente indicated she would read the Miranda warnings again, Brown responded "You read them twice!" She responded "I understand that, but you said I don't want to talk to you and now you want to talk to your lawyer." We cannot, however, despite DiClemente's assertion, find any clear indication in the transcript that Brown specifically demanded counsel.[16] Because of this inconsisten-

---

**12.** *Id.* at 632, 106 S.Ct. 1404.

**13.** *Maine v. Moulton*, 474 U.S. 159, 170–171, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985) (footnote omitted).

**14.** *Brewer*, 430 U.S. at 404, 97 S.Ct. 1232 (citing *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461, (1938)); *see Id.*

**15.** *Jackson*, 475 U.S. at 631, 106 S.Ct. 1404.

**16.** We do know that a lapse occurred in taping the interrogation. However, no one inquired at the suppression hearing about the consequences of the untaped time interval. We do know that some time during the untaped interval, Brown may have expressed the view that "you (Brown) expressed the view that you wanted to talk to us *again* ...." That lull followed by the interrogator's comment confirms that at least at some point Brown had cut off the interrogation.

cy, it was essential for the trial judge to request additional evidence before determining the admissibility of Brown's statement.[17]

After Brown invoked his right to counsel, admissibility of any of his statements rested on whether the police "deliberately elicited" information from him.[18] The deliberate elicitation standard differs from custodial interrogation.[19] Deliberate elicitation focuses on whether "the police officer deliberately and designedly set out to elicit information from the accused...."[20] In *United States v. Henry*, the United States Supreme Court suppressed statements made by the defendant to a jailhouse informant because the informant "had 'some conversations with Mr. Henry' while he was in jail and Henry's incriminatory statements were 'the product of this conversation.'"[21] "By intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the Government violated Henry's *Sixth Amendment* right to counsel."[22] Thus, deliberate elicitation means any action taken by the State designed to result in a response by Brown.[23]

The trial judge's decision to admit the statement rested on her belief that Brown did not make his statement to the NYPD officers in response to interrogation. In her ruling, the trial judge stated: "I find that what the defendant commented on was what Detective DiClemente told the defendant and not to clarify what the defendant had told Detective DiClemente. Therefore, even—[sic] it was not part of a clarification of any statement that the defendant made at the interrogation, which was suppressed."; "It would be clear to any reasonable person that the interrogation had ceased."; and, finally, "I should say both [NYPD officers] testified that they, under their own procedures, would not have conducted an interrogation at that point...." Because the trial judge admitted Brown's statement without a full analysis of the circumstances surrounding the interrogation, under the "deliberate elicitation" standard, we must remand this case for a further factual inquiry focused on whether the police deliberately elicited Brown's statement.

We conclude that the trial judge must undertake a more detailed review of all the circumstances, including the initial interrogation. The trial judge indicated that "if I'm going to have to get into exactly what happened during that interview, I'm going to have to have more evidence in front of me." We agree with that observation.

17. *See McNeil v. Wisconsin*, 501 U.S. 171, 177, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) ("If the police do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards. This is 'designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights[.]'") (quoting *Michigan v. Harvey*, 494 U.S. 344, 350, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990)).

18. *Massiah*, 377 U.S. at 206, 84 S.Ct. 1199.

19. See string citation in *Fellers*, 540 U.S. at 524, 124 S.Ct. 1019 (2004), listing cases that distinguish between deliberate elicitation and custodial interrogation.

20. *Brewer v. Williams*, 430 U.S. 387, 399, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977).

21. 447 U.S. 264, 270, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980).

22. *Id.* at 274, 100 S.Ct. 2183.

23. In contrast, incriminating statements obtained by "luck or happenstance" after the right to counsel has attached do not violate the *Sixth Amendment*. *See Moulton*, 474 U.S. at 176, 106 S.Ct. 477.

Although the cold transcript may have been sufficient evidence under a *Fifth Amendment* analysis, the confusing transcript does not support the finding of an unsolicited utterance for the purposes of the *Sixth Amendment.* Viewed in absolute isolation, Brown spontaneously erupted, confessing murder to the police without any spark. But put in context, Brown's NYPD statement alludes to and arguably remains at least partially yoked with the earlier WPD illegal interrogation and, thus, may be a response that DiClemente "deliberately elicited" from Brown.

On remand, the trial judge must, first, assess whether Brown invoked his right to counsel, at least at some point. DiClemente apparently believed he did. Then, second, under the deliberate elicitation standard of the *Sixth Amendment,* the trial judge needs to engage in a broader factual inquiry than simply a review of the transcript and the events at play in the NYPD police car. The trial judge indicates in her ruling that Brown responded to something said by Detective DiClemente. The question that must be addressed on remand is whether, by making whatever remarks she did, DiClemente, during her WPD interrogation, "intentionally creat[ed] a situation likely to induce [Brown] to make incriminating statements" [24] after the unconstitutional WPD interrogation ended. The trial judge must consider whether any actions by DiClemente were deliberately designed to elicit Brown's incriminating remarks.[25] If DiClemente intended that Brown respond to

her question at any time after he had requested counsel, the statement must be suppressed as a "deliberate elicitation."

At least one interpretation of the incomplete factual record would support an inference that DiClemente deliberately elicited Brown's response. In particular, we are concerned how DiClemente made her final accusation followed by an immediate and sudden end to the interrogation signaled by the unidentified taped voice. This tactic might have been purposefully coercive and supports an inference that DiClemente deliberately intended to elicit a response from Brown. Under this possible interpretation of the transcript, DiClemente interrogated Brown in blatant disregard of his *Sixth Amendment* rights, heatedly accused him of committing murder, and cut him off before giving him an opportunity to respond. Suddenly, at his first opportunity to speak after the abrupt end to the interrogation, Brown anxiously—and perhaps compulsively—explained to the NYPD officers how DiClemente "had it all wrong," and then "confessed" to the murder while correcting the accusations about him at the initial interrogation. If a full record supported this account, one could rationally conclude that WPD "deliberately elicited" Brown's utterance to the NYPD.[26]

In order for the trial judge to admit Brown's NYPD statement, the State must introduce additional evidence about the interrogation that would support a conclusion that despite its connection to com-

---

**24.** *Henry,* 447 U.S. at 270, 100 S.Ct. 2183.

**25.** *See Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986).

**26.** We do not imply that these inferences must be drawn. We merely rely on this narrative to explain how the obfuscated record before us can lead to number of potential different interpretations. Moreover, although we be-

lieve this set of circumstances would demonstrate that the police deliberately elicited Brown's utterance, this is not the only possible interpretation of what happened. If the trial judge is satisfied that DiClemente sought to have Brown respond to her accusation then his statement would have been "deliberately elicited" regardless of to whom or which officers he directed his "response."

ments made in the initial interrogation, the WPD officers did not deliberately elicit further comment by Brown after he invoked his right to counsel. As we have explained above, the transcript, alone and without more, does not carry the State's burden to show that DiClemente did not deliberately elicit Brown's statement.

Accordingly, we remand this case for further factual findings about whether DiClemente deliberately elicited Brown's response. If the trial judge determines that the statement must be excluded, the trial judge has the power to vacate the conviction and require a new trial. If the trial judge finds that the NYPD statement passes *Sixth Amendment* muster, Brown can appeal that decision and we would have an appropriate factual record to review that decision on appeal.

### Brown's Other Arguments

Brown suggests that we should apply the "fruit of the poisonous tree" doctrine used for violations of the *Fourth Amendment* to this violation of the *Sixth Amendment.*[27] Specifically he argues that the police obtained his NYPD statement as a product of his earlier unconstitutional interrogation, and without sufficient attenuation, the statement should be suppressed. The State, meanwhile, asserts that the United States Supreme Court, in *Oregon v. Elstad,*[28] vitiated the "fruit of the poisonous tree" analysis from *Miranda* violations and substituted a voluntariness evaluation to determine admissibility of a later statement by a defendant. Because we remand for further factual inquiry on whether the police deliberately elicited Brown's response, we need not address this open "fruits" question under the *Sixth Amendment.*

 Brown also argues that two videotaped statements introduced by the State should have been excluded from evidence. Under 11 *Del. C.* § 3507, the State may introduce a "voluntary out-of-court prior statement of a witness." Brown argues that the police obtained these video taped statements by coercion and not voluntarily. We review the trial judge's admissions of statements under section 3507 for abuse of discretion.[29]

The State introduced videotape statements from two witnesses to the shooting, Ruth Ann Clark and JoAnn Brown. Brown objected and argued that the State obtained the statements by coercion. After *voir dire* of both witnesses, the trial judge admitted both statements. Although both witnesses appeared reluctant, the trial judge found "nothing in the conduct of law enforcement officers was inappropriate and which would affect the voluntary nature of the statement." On appeal, Brown argues that the police coerced the statements when they threatened the witnesses with jail time if they did not cooperate with the investigation. However, Brown fails to recognize that the voluntariness inquiry rests on "whether the behavior of the interrogators was such as to overbear the will of the defendant to resist and bring about a statement not the product of a rational intellect and a free will."[30] Brown does not point to any conduct by the police that limited Ruth Ann and JoAnn from exercising their "rational intellect" and "free will." Therefore, the trial judge properly admitted these statements.

 Finally, Brown contends that the trial judge should have ordered a mis-

**27.** *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

**28.** 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

**29.** *Barnes v. State,* 858 A.2d 942, 944 (Del. 2004).

**30.** *Baynard v. State,* 518 A.2d 682, 691 (Del. 1986) (internal quotations omitted).

trial when the State provided Brown with a transcript of a police interview with Ruth Ann after she testified. We review a denial of a motion for mistrial for abuse of discretion.[31] Under Superior Court Criminal Rule 26.2 and *Jencks v. United States*,[32] the State must provide the defense, when requested, with recorded statements made by the State's witnesses to the State's agents. The State apparently failed to disclose a transcript of a police interrogation of Ruth Ann to Brown until after Ruth Ann testified. Brown's counsel moved for a mistrial. A trial judge must order a mistrial when "no meaningful and practical alternatives" as remedies exist.[33] Rather than ordering a mistrial to cure the State's apparent *inadvertent* failure to disclose the transcript, the trial judge gave Brown the option to recall Ruth Ann. Brown did not. On appeal, Brown concedes that the State did not delay disclosure out of "willful avoidance or egregious dereliction." Moreover, Brown offers no facts to support nor proffers any reason why this delay and the trial judge's proposed remedy prejudiced him. Therefore, the trial judge properly denied Brown's motion for a mistrial.

### CONCLUSION

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is **AFFIRMED**, in part, and **REMANDED**, in part. Jurisdiction is retained.

---

**31.** *Taylor v. State*, 685 A.2d 349 (Del.1996)

**32.** 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957).

**33.** *Bailey v. State*, 521 A.2d 1069, 1077 (Del. 1987).