# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE, | ) | |
| | ) | |
| v. | ) | I.D. Nos. 1906017002 |
| | ) | & 1906016532 |
| JUSTIN M. TOPOLSKI, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Submitted: December 19, 2022
Decided: February 7, 2023

## MEMORANDUM OPINION AND ORDER

***Upon Defendant's Motion to Dismiss***
**DENIED WITHOUT PREJUDICE**

***Upon Defendant's Motion for a Writ of Habeas Corpus***
**DEFERRED AND SUPPLEMENTAL BRIEFING ORDERED**

Stephen Welch, Jr., Deputy Attorney General, Department of Justice, Dover, Delaware, *Attorney for the State.*

John R. Garey, Esquire, John R. Garey, PA, Dover, Delaware, *Attorney for Defendant.*

**Primos, J**.

Before this Court is Defendant Justin Topolski's Motion for a Writ of *Habeas Corpus* and Dismissal of the criminal charges against him. Mr. Topolski faces nine felony charges, including attempted murder in the first degree. However, for over three years, he has been incompetent to stand trial and has been held in custody at the Delaware Psychiatric Center (the "DPC") pending efforts to restore him to competency. In light of the most recent reports from the DPC, such efforts now appear to be futile. Thus, the questions now before the Court are 1) whether Mr. Topolski's state and federal speedy trial rights have been violated and 2) whether continued confinement at the DPC is consistent with Mr. Topolski's rights under the Equal Protection and Due Process clauses of the United States Constitution. For the reasons that follow, Mr. Topolski's motion to dismiss on speedy trial grounds is **DENIED WITHOUT PREJUDICE** and his motion for a writ of habeas corpus is **DEFERRED** pending supplemental briefing.

## FACTUAL AND PROCEDURAL BACKGROUND

Mr. Topolski suffers from schizoaffective disorder (bipolar type), which causes him to experience bizarre delusional beliefs. On or around June 25, 2019, he was arrested after police responded to a domestic incident at his mother's home. The allegations against him are summarized here as follows:[1] While holding a ten-to-twelve-inch kitchen knife in one hand, Mr. Topolski used his other hand to push his mother to the ground, threatening to kill her and to cut her head off. His mother escaped and contacted the police. When the police arrived at the scene, Mr. Topolski remained in the house with a rifle, and, over the course of a long stand-off, fired two shots in the direction of the responding officers. The bullets struck the police car

---

[1] At this stage of the proceedings, as explained below, the State has presented a prima facie case in support of the charges against Mr. Topolski, and this summary of allegations is based upon that evidence. However, Mr. Topolski has not been tried, and is presumed innocent of the allegations and charges against him until found guilty beyond a reasonable doubt.

near where one of the officers had been standing. When Mr. Topolski was finally taken into custody, he expressed surprise that there was not a body near the car, because he believed he had shot and killed one of the police officers.

Mr. Topolski was indicted on September 4, 2019, on nine separate criminal counts, including attempted murder in the first degree. He was first committed to the DPC on November 19, 2019, to undergo a psychological evaluation.[2] In that evaluation, Dr. Douglas Roberts of the DPC opined that Mr. Topolski was not competent to stand trial.[3] While Mr. Topolski had some ability to explain the charges against him and the nature of court proceedings (e.g., the respective roles of the prosecutor, the defense attorney, and the judge), Dr. Roberts explained that Mr. Topolski's "paranoid delusional beliefs about his mother and about the police officers who responded to his home" would unduly influence his legal strategy and preclude him from collaborating rationally with his attorney.[4] At that time, Dr. Roberts described his prognosis for restoration of competency as "guarded."[5]

On March 16, 2020, the Court granted Mr. Topolski's motion for another psychological evaluation addressing his mental status at the time of the alleged offenses, his competency to stand trial, and, if he was found incompetent, "the status of any competency restoration efforts and [Mr.] Topolski's prognosis for restoration."[6] An updated report was then filed with the Court, in which Dr. Roberts reported that little had changed and explained that Mr. Topolski "continues to experience significant psychiatric symptoms which are interfering with his ability to

---

[2] D.I. 10.
[3] DPC Report (Nov. 25, 2019) at 8.
[4] *Id.* at 7–8.
[5] *Id.* at 8.
[6] D.I. 15 and 17.

view his case from a reality-based perspective."[7]  In light of the "lack of progress thus far," Dr. Roberts switched his prognosis for competency restoration to "poor."[8]

In advance of a scheduled competency hearing, Dr. Roberts filed another report with the Court.  In that report, he indicated that Mr. Topolski's mental condition was substantially the same, but that he had begun taking a new antipsychotic medication.  The report explained that the new medication was "likely not acting to its full potential yet" and that it was "possible" that Mr. Topolski's condition might improve.[9]  However, if he did not respond to the medication (or had to cease taking it due to side effects), his "prognosis for restoration would be extremely poor, given all the options that have been tried to date."[10]

On May 19, 2021, the Court held a competency hearing, in which it heard testimony from Dr. Roberts.[11]  The Court later issued a bench decision finding Mr. Topolski incompetent to stand trial,[12] noting that it was persuaded by Dr. Roberts's conclusion that Mr. Topolski's delusional beliefs, particularly those surrounding the alleged offenses, undercut his ability to rationally understand the proceedings or to participate in his defense.  The Court further noted that, while Mr. Topolski's prognosis for competency restoration had gotten progressively worse, there remained some possibility that he might be restored to competency and ordered him to remain at the DPC for continued efforts at competency restoration.

In another report dated December 1, 2021, Dr. Roberts informed the Court in writing that the new medication had been permanently discontinued because of

---

[7] DPC Report (May 5, 2020) at 6.

[8] *Id.*  In a supplemental report ordered by the Court, Dr. Roberts also opined that Mr. Topolski's mental state at the time of the alleged offenses was consistent with findings of both Guilty But Mentally Ill and Not Guilty by Reason of Insanity.  DPC Report (June 18, 2020) at 4–5.

[9] DPC Report (May 3, 2021) at 4.

[10] *Id.*

[11] D.I. 38.  In his testimony, Dr. Roberts indicated that the new medication referenced in his May 3, 2021, report had been discontinued due to adverse side effects.

[12] D.I. 39.

symptoms indicating that Mr. Topolski was allergic to it.[13]  Dr. Roberts informed the Court that, as a last resort, Mr. Topolski had consented to and was scheduled to be treated with Electroconvulsive Therapy ("ECT"), which in some cases is an "effective treatment for treatment-resistant psychotic disorders."[14]  However, in a follow-up report dated January 27, 2022, Dr. Roberts explained that Mr. Topolski had completed seven out of eleven scheduled ECT treatments before revoking his consent to the further use of ECT.[15]  Dr. Roberts conducted another competency interview and found that Mr. Topolski's delusional beliefs about the factual nature of the alleged offenses continued to render him incompetent to stand trial.[16]  As to his prognosis, Dr. Roberts opined that it was "***highly unlikely*** that Mr. Topolski will ever reach a point of clinical stability in which he will be competent to proceed."[17]

The Court held three office conferences in the following months, discussing with counsel how to proceed in light of Mr. Topolski's poor prognosis for competency restoration.  The State considered but ultimately rejected the option of voluntarily entering a *nolle prosequi* in the criminal case and pursuing a civil commitment instead.  Subsequently, on Mr. Topolski's motion, the Court held a prima facie hearing on September 15, 2022, pursuant to 11 *Del. C.* § 404(a), in which the State outlined its case against Mr. Topolski through police officer testimony and a series of photographs.  At the conclusion of the hearing, the Court issued a bench ruling concluding that the State had met its prima facie burden of showing "some credible evidence tending to prove the existence of each element of the offense" for

---

[13] DPC Report (Dec. 1, 2021) at 2.
[14] *Id.* at 2–3.
[15] DPC Report (Jan. 27, 2022) at 3–4.
[16] *Id.* at 7.  Dr. Roberts also noted that "this evaluation is the first in which [Mr. Topolski] claimed to not remember the charges or allegations against him, which could potentially be a side effect of ECT, or could be a manifestation of a lack of effort in the evaluation."  *Id*.
[17] *Id.* (emphasis in original).

each charge, pursuant to 11 *Del. C.* § 301(a), and that continued detention at the DPC was therefore authorized under 11 *Del. C.* § 404(a).

Mr. Topolski filed the instant motion for a writ of habeas corpus and dismissal of charges on September 27, 2022, arguing that continued detention violates his rights to due process and equal protection of the law and that his right to a speedy trial compels dismissal of the charges against him.[18]  The State filed a response to the defense motion on December 5, 2022, opposing the motion and arguing that Mr. Topolski's continued detention is lawful.[19]  However, the State conceded "that the defendant cannot necessarily be held indefinitely."[20]  Mr. Topolski filed his reply to the State's response on December 19, 2022, and the matter was submitted to the Court for decision.[21]

After the filing of the defense motion (but before the State's response was filed), the DPC submitted its most recent report on October 3, 2022.  In that report, Dr. Andrew Donohue of the DPC concluded that Mr. Topolski remained incompetent to stand trial, noting first that Mr. Topolski "did not describe fully intact understanding of the charges against him."[22]  The report went on to explain that Mr. Topolski's various misunderstandings and/or delusions "substantially impaired" his rational understanding of the proceedings against him.[23]  Regarding the possibility of competency restoration, the report concluded that there was no sign of improvement despite the administration of "numerous antipsychotic medications"

---

[18] Mot. for a Writ of Habeas Corpus and Dismissal [hereinafter "Def.'s Mot."].
[19] Resp. to Mot. for Writ of Habeas Corpus & Dismissal [hereinafter "State's Resp."].
[20] *Id*. ¶ 24.
[21] Mot. in Resp. to the State's Resp. for a Writ of Habeas Corpus and Dismissal.
[22] DPC Report (Oct. 3, 2022) at 7.
[23] *Id.*

and "a truncated course of electroconvulsive therapy."[24]  "Of note," the report added, "the partial course of ECT did not result in any noticeable beneficial response."[25]

## DISCUSSION

Mr. Topolski challenges both the continued pendency of criminal charges against him, arguing for dismissal on speedy trial grounds, and his continued pre-trial incarceration on those charges, seeking habeas relief on equal protection and due process grounds.  Considering the speedy trial claim first, the Court concludes that the reason for the delay is Mr. Topolski's incompetency to stand trial and follows courts from other jurisdictions in holding that a defendant's incompetency to stand trial, when not attributable to any particular action or inaction by the State, weighs heavily against dismissal of the charges on speedy trial grounds. Turning to the Fourteenth Amendment challenges to his continued confinement, the Court concludes that Mr. Topolski is unlikely to be restored to competency in the foreseeable future.  Accordingly, based on the United States Supreme Court's decision in *Jackson v. Indiana*,[26] he may no longer be confined solely on account of his incompetency to stand trial on the pending charges against him, without a finding of dangerousness.  However, the court will defer decision on his habeas petition pending supplemental briefing on the heretofore overlooked statutory provision, codified at 11 *Del. C.* § 403(b), entitling an incompetent defendant to release upon a judicial determination that his release will not endanger public safety.

## I.      Motion to Dismiss on Speedy Trial Grounds

The right to a speedy trial is protected by the Sixth Amendment to the United States Constitution and by Article I, § 7 to the Delaware Constitution.[27]  Since the

---

[24] *Id.* at 8.
[25] *Id*.
[26] 406 U.S. 715 (1972).
[27] *Middlebrook v. State*, 802 A.2d 268, 272 (Del. 2002).

federal and state constitutional speedy trial guarantees typically parallel one another,[28] and no separate analysis has been argued for here, the Court will consider them in tandem. "[F]ederal and Delaware courts apply a four-part test to determine whether a defendant's right to a speedy trial has been violated. Under this test, courts are to evaluate the following factors: (1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of the right to a speedy trial; and (4) prejudice to the defendant."[29] A defendant must make a threshold showing that the first factor, length of delay, weighs in his favor before the other three are considered.[30] These four factors are known as the *Barker v. Wingo* factors, from the United States Supreme Court case of that name.[31]

As a threshold matter, the first factor, length of delay, weighs in favor of Mr. Topolski. The right to a speedy trial "attaches as soon as the defendant is accused of a crime through arrest or indictment, whichever occurs first."[32] Thus, the speedy trial clock for Mr. Topolski started to run upon his arrest in 2019. The State concedes that this delay, now over three years, is presumptively prejudicial.[33]

The second factor is the reason for the delay. There is no dispute that the ultimate cause of the delay is Mr. Topolski's incompetency and prolonged yet

---

[28] *Scott v. State*, 521 A.2d 235, 239 n.2 (Del. 1987).

[29] *Page v. State*, 934 A.2d 891, 896 (Del. 2007) (internal citation omitted).

[30] *See Skinner v. State,* 575 A.2d 1108, 1115 (Del. 1990) ("The threshold consideration is the length of the delay. Unless 'there is some delay which is presumptively prejudicial,' there is no reason to review the other factors." (quoting *Scott*, 521 A.2d at 239)); *see also Doggett v. United States*, 505 U.S. 647, 651–52 (1992) ("Simply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from presumptively prejudicial delay, since, by definition, he cannot complain that the government has denied him a speedy trial if it has, in fact, prosecuted his case with customary promptness." (internal quotations and citations omitted)).

[31] 407 U.S. 514 (1972).

[32] *Middlebrook*, 802 A.2d at 273.

[33] State's Resp. ¶ 27; *see Cooper v. State*, 32 A.3d 988, 2011 WL 6039613, at *7 (Del. 2011) (TABLE) ("This Court has found that if the delay between arrest or indictment and trial exceeds one year, the Court generally should consider the other *Barker* factors.").

unsuccessful efforts at competency restoration. However, the parties nevertheless dispute whether this factor weighs against the State or against the defendant. Mr. Topolski lays the blame with the State, arguing that "[t]hree years and three months is an exceedingly long period to attempt to restore one to competency" and that this "length of time shows a lackadaisical approach by the state [sic]."[34] The State, on the other hand, faults Mr. Topolski for discontinuing the ECT treatments, and argues that this case is analogous to recent Delaware cases in which speedy trial claims were denied because a mentally ill defendant refused to cooperate with competency restoration efforts.[35] However, the Court finds neither party especially blameworthy for this situation. The State, via DPC personnel, has been diligently attempting to restore Mr. Topolski to competency, to no avail. On the other hand, the Court declines the State's invitation to fault Mr. Topolski for discontinuing ECT treatments, an extreme last-resort procedure with serious potential side effects, and which, according to DPC reports, did not appear to be generating any improvement in Mr. Topolski's condition despite completion of slightly over half of the course of treatment.

The question, then, is not whom to blame for Mr. Topolski's incompetency to stand trial, but how that fact on its own weighs in the speedy trial analysis. Most courts to consider this question have concluded that, because an incompetent defendant may not be brought to trial without violating his or her due process rights, delays caused by a defendant's incompetency alone (without some delay or fault

---

[34] Def.'s Mot. ¶¶ 30 and 32.

[35] State's Resp. ¶¶ 35 and 37; *see State v. Draughn*, 2016 WL 7105933, at *6 (Del. Super. Nov. 29, 2016) (Comm'r Report and Recommendation) ("Balancing the four *Barker v. Wingo* factors, I find that the reason for the delay—Draughn's schizophrenic and obstructionist behavior—outweighs all other factors at this point in time."); *State v. Williamson*, 2020 WL 2790488, at *9 (Del. Super. May 29, 2020) ("The DPC records demonstrate an ongoing refusal by Defendant to comply with medication and individual therapy. Balancing the four *Barker v. Wingo* factors, Defendant significantly caused the extended delay, which outweighs the other points.").

attributable to the state) do not violate a defendant's federal constitutional right to a speedy trial.[36] In particular, the Court finds persuasive the reasoning of the Supreme Court of Kansas, which addressed a similar Sixth Amendment speedy trial claim in *Matter of Snyder*.[37] The defendant in *Snyder*, like Mr. Topolski, was incompetent to stand trial, and his chances of restoration to competency were "minimal, if not nonexistent."[38] In that case, the court assumed without deciding that three factors— length of delay, assertion of the right, and prejudice to the defendant—weighed in the defendant's favor, but nevertheless concluded that "his speedy trial claim is still foreclosed by the sole reason for the delay—his incompetency to stand trial."[39] As the court further explained, "[t]he bottom line is [that] Snyder cannot be tried in a condition of incompetency without running afoul of due process."[40] Thus, the delay

---

[36] *See Matter of Snyder*, 422 P.3d 1152, 1155 (Kan. 2018) ("Though the Sixth Amendment guarantees an accused the right to a speedy a trial, the stubborn fact remains—Snyder cannot be constitutionally tried while incompetent."); *State v. Mendoza*, 774 P.2d 440, 443 (N.M. 1989) ("During the time an accused's competency is being assessed, he or she is unavailable for trial. Regardless of who initiates the proceeding a competency examination is clearly on behalf of the accused and in no way infringes on that person's speedy trial rights."); *United States v. Mills*, 434 F.2d 266, 271 (8th Cir. 1970) ("[D]elays encountered in bringing a defendant to trial who claims to be incompetent or who is temporarily incompetent ordinarily do not infringe upon his Sixth Amendment right to a speedy trial."); *Langworthy v. State*, 416 A.2d 1287, 1293 (Md. Ct. Spec. App. 1980) ("[O]nce an accused has been determined to be incompetent, the deferral of his trial pending a return to competency does not offend any right to a speedy trial under the Sixth Amendment."); *State v. Woodland*, 945 P.2d 665, 670 (Utah 1997) ("That delays caused by questions of competency do not impinge on an accused's right to a speedy trial is well established."). In addition, the federal Speedy Trial Act (which is separate from the Sixth Amendment guarantee and does not apply to criminal prosecutions in state court) excludes "[a]ny period of delay resulting from the fact that the defendant is mentally incompetent or physically unable to stand trial" from the computation of time within which a defendant must be brought to trial. 18 U.S.C. § 3161(h)(4).

[37] 422 P.3d at 1155–56.

[38] *Id.* at 1158 (quoting *Jackson*, 406 U.S. at 727); *see also id.* at 1154 ("During this time, a series of . . . reports indicated that Snyder's progress toward competency was minimal and slow.").

[39] *Id.* at 1155.

[40] *Id.* at 1156.

was in no way attributable to the state, and the court concluded that there was no speedy trial violation.[41]

State v. Hinton, the rare Delaware case dismissing charges against an incompetent defendant on speedy trial grounds, is consistent with this general rule.[42] In that case, a Superior Court commissioner reasoned that, because the State has a compelling interest in bringing a defendant to trial and bears the burden of proving the defendant's competence (by a preponderance of the evidence) in order to do so, "the onus is necessarily on the State to provide a mechanism for competency restoration—something it does in most instances, but unfortunately, not for non-incarcerated defendants."[43] Since the defendant in Hinton was not incarcerated, and the State offered no outpatient competency restoration services, the Commissioner concluded that the defendant's continued incompetency counted against the State in the speedy trial analysis.[44] The reasoning in Hinton is thus inapplicable here, since Mr. Topolski is committed to the DPC and has been provided competency restoration services, albeit unsuccessful, over the course of his detention there. In sum, Mr. Topolski's incompetency to stand trial, despite consistent restoration efforts, weighs heavily against a finding of a speedy trial violation.

As to the third factor, the instant motion is the first time Mr. Topolski has invoked his speedy trial right, though the Court notes that it was alluded to in his

---

[41] Id.

[42] 2018 WL 366971 (Del. Super. Jan. 11, 2018) (Comm'r Report and Recommendation).

[43] Id. at *3.

[44] Id. at *3–4 ("Balancing the four Barker v. Wingo factors, I find that the reason for the delay—the State's inaction and ultimate inability to restore Hinton to competency—outweighs all other factors at this point in time. Therefore, I am recommending that the charges against him in both cases be dismissed."); see also State v. Cooper, 2018 WL 2129728, at *2 (Del. Super. May 7, 2018) (Comm'r Report and Recommendation) (dismissing charges on speedy trial grounds where State failed to pursue a motion for involuntary medication after DPC reports indicated that such medication was the only path to competency restoration), report accepted, 2018 WL 2448109 (Del. Super. May 25, 2018).

motion for a prima facie hearing.[45]  Fourth and finally, under the prejudice prong, the Court must consider "three of defendants' interests that the speedy trial right was designed to protect: (1) preventing oppressive pretrial incarceration; (2) minimizing the anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired."[46]  The Court is persuaded that all three of these factors are present to some degree here—Mr. Topolski has been incarcerated for over three years, faces serious criminal charges, and, in addition to the normal fading of evidence, may have suffered some retrograde amnesia as a result of the ECT treatments.[47]

In sum, the first and fourth factors, length of delay and prejudice to the defendant, weigh in favor of Mr. Topolski's speedy trial claim.  The third factor, assertion of the right, carries relatively little weight at this juncture.  However, the dispositive issue in this case is the reason for the delay.[48]  Here, the reason for the delay is the unfortunate but unavoidable reality that Mr. Topolski has remained incompetent to stand trial since the proceedings against him were initiated, rendering it impossible to bring him to trial or to allow him to enter a plea without violating his right to due process.  At this point, in light of the fact that Mr. Topolski's right to a speedy trial was invoked for the first time in this motion, the reason for delay— Mr. Topolski's incompetency to stand trial despite the DPC's best efforts—

---

[45] Mot. For an 11 *Del. C.* § 404 Prima Facie Hearing ¶ 12 (referring to a "forthcoming motion to release Mr. Topolski from the custody of the Department of Corrections under the 5th, **6th**, and 14th Amendments to the United States Constitution of America and **Article I, Section 7 of the Delaware Constitution** of 1897." (emphasis supplied)).

[46] *Middlebrook*, 802 A.2d at 276.

[47] *See* supra note 16; Def.'s Mot. Ex. A (journal article explaining that retrograde amnesia is a potential side effect of ECT treatment).

[48] *See Bailey v. State*, 521 A.2d 1069, 1081 (Del. 1987) (observing that a "speedy trial argument usually stands or falls" on the reason for the delay).

outweighs the other factors, and the motion to dismiss on speedy trial grounds is **DENIED WITHOUT PREJUDICE**.[49]

## II. Writ of Habeas Corpus

That Mr. Topolski's criminal charges are not subject to dismissal does not necessarily mean that his continued pretrial commitment at the DPC is permissible. The Equal Protection and Due Process clauses of the United States Constitution limit the state's power to subject an incompetent defendant to indefinite pretrial incarceration. The Court will review the seminal case for this proposition, *Jackson v. Indiana*,[50] as well as the Delaware statutes governing the commitment of incompetent defendants, before turning to the merits of Mr. Topolski's due process and equal protection arguments.

### a. *Jackson v. Indiana*

In *Jackson v. Indiana*, the United States Supreme Court addressed a constitutional challenge to Indiana's pretrial commitment of an intellectually disabled defendant pending minor property offenses for which he was deemed incompetent to stand trial.[51] Given the defendant's dim prognosis for attaining competency, the defense argued that "commitment under these circumstances amounted to a 'life sentence'" without a criminal conviction.[52] Reversing the state courts, the Supreme Court held that "Indiana cannot constitutionally commit the petitioner for an indefinite period simply on account of his incompetency to stand trial on the charges filed against him."[53]

---

[49] The Court need not address at this point whether future invocation of the right, coupled with further passage of time and the prejudice already discussed, could eventually outweigh the reason for delay—Mr. Topolski's incompetence to stand trial—and thus warrant dismissal of the charges against him.

[50] 406 U.S. 715 (1972).

[51] *Jackson*, 406 U.S. at 717–19.

[52] *Id.* at 719.

[53] *Id.* at 720.

The Indiana statute at issue in *Jackson* provided that, after a hearing at which a defendant was found incompetent by the court, the defendant would be confined in an "appropriate psychiatric institution" until "the defendant shall become sane," at which point he or she would stand trial.[54] The Indiana statute did not provide for any scenario, besides restoration of competency, that would result in the defendant's release, and the Supreme Court emphasized that there was "no statutory provision for periodic review of the defendant's condition by either the court or mental health authorities."[55] Indiana's generally applicable civil commitment statute, by contrast, provided for more extensive procedural requirements.[56]

The Supreme Court based its ruling first on the Equal Protection Clause, holding that pending criminal charges did not justify "a more lenient commitment standard" and "a more stringent standard of release" than applicable to the general public under Indiana's civil commitment statute.[57] The Court also found a "closely related" violation of the Due Process Clause,[58] and held that an incompetent defendant "cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future."[59] Once that reasonable time expires, the state must choose between civil commitment or release of the defendant.[60]

### b. Applicable Delaware Statutes

Pursuant to 11 *Del. C.* § 404(a), a criminal defendant who is incompetent to stand trial may "be confined and treated in the Delaware Psychiatric Center until the

---

[54] *Id.*
[55] *Id.*
[56] *See id.* at 721–22 (explaining Indiana's civil commitment procedures).
[57] *Id.* at 729–30.
[58] *Id.* at 731.
[59] *Id.* at 738.
[60] *Id.*

accused person is capable of standing trial."[61]  Upon the defendant's motion, the State bears the burden of presenting "sufficient evidence to constitute a prima facie case" against the defendant.[62]  In other words, the State must put forward "some credible evidence tending to prove the existence of each element of the offense."[63]  If the State fails to meet this burden, the Court "shall dismiss the charge" and that dismissal "shall have the same effect as a judgment of acquittal."[64]  If, on the other

---

[61] 11 *Del. C.* § 404(a).

[62] *Id.*

[63] 11 *Del. C.* § 301(a).  The Court is aware of two published cases applying instead the "prima facie" standard used in reverse-amenability hearings, i.e., whether there is a fair likelihood of conviction, in a § 404(a) hearing.  *See State v. Tankard*, 2014 WL 10187038, at *1–2 (Del. Com. Pl. Nov. 10, 2014) ("There is no case law directly on-point in this regard, but such a hearing is analogous to a hearing conducted when the Superior Court makes a determination on whether to return a juvenile's case to the Family Court. . . . Accordingly, this Court finds that if a defendant moves for a sufficiency-of-evidence hearing under § 404, the State is required to present evidence that is fairly likely to lead to the conviction of the defendant at trial."); *State v. Oakley*, 2022 WL 1504926, at *2 (Del. Super. May 11, 2022) (relying on *Tankard* for the same proposition); *see also State v. Oakley*, 2023 WL 1127269, at *1 (Del. Super. Jan. 30, 2023) (noting that the defendant "requested a consolidated hearing to determine whether the State has made out a *prima facie* case against Defendant, pursuant to 10 *Del. C.* § 1011 and 11 *Del. C.* § 404").  However, in the case of a § 404(a) hearing, the requirement of a prima facie case is created and defined by statute within Title 11 of the Delaware Code. *See* 11 *Del. C.* § 404(a) (using the term "prima facie case"); 11 *Del. C.* § 301(a) (stating that "a prima facie case for the State consists of some credible evidence tending to prove the existence of each element of the offense").  The prima facie standard required in a reverse amenability hearing, by contrast, was created and defined by the Delaware Supreme Court to implement the "nature of the present offense" provision of what is now 10 *Del. C.* § 1011. *See Marine v. State*, 607 A.2d 1185, 1211 (Del. 1992) ("[W]e construe the 'nature of the present offense' provision of section 939 as requiring that [the] Superior Court consider whether the State can establish a *prima facie* case against the defendant."); *see also State v. Mayhall*, 659 A.2d 790, 791 (Del. Super. 1995) (explaining that a prima facie case in a reverse amenability hearing means "something more than whether some credible evidence exists tending to prove each element of the offense charged"), *aff'd sub nom. Holder v. State*, 692 A.2d 882 (Del. 1997).  The Court sees no indication that the Delaware Supreme Court intended this test to supplant the statutory definition of a prima facie case found in Title 11.  "A statute can define its terms as the lawmakers see fit in order to make clear what is intended." *Stiftel v. Malarkey*, 384 A.2d 9, 11 (Del. 1977).  Thus, the Court disagrees with the standard applied in *Tankard* and *Oakley*, neither of which cite the explicit statutory definition of a prima facie case provided in 11 *Del. C.* § 301(a).

[64] 11 *Del. C.* § 404(a).

15

hand, the State meets its burden of presenting a prima facie case, § 404(a) is silent as to the duration of confinement.[65]

However, one other limitation (addressed in neither the briefs nor any case law the Court has identified) is found in 11 *Del. C.* § 403(b), which provides that a person confined in accordance with § 404 will be secured at the DPC "*until* the Superior Court of the county wherein the case would be tried or was tried is satisfied that *the public safety will not be endangered by the patient's release*."[66]  The court shall "reconsider the necessity of continued detention" after the patient has been detained for 1 year, and upon motion on the patient's behalf or when advised by the DPC that "the public safety will not be endangered by the patient's release."[67]

Thus, while the Indiana statute at issue in *Jackson* provided no avenue for release once a defendant was charged with a crime and found incompetent (other than restoration of competency), Delaware law provides two.  First, the charges against the defendant will be dismissed if the State fails to make a prima facie case of the defendant's guilt.  Second, the defendant will be released pursuant to § 403(b) if such release will not endanger public safety.

Two decisions of this Court construing 11 *Del. C.* § 404(a) in light of *Jackson v. Indiana* are instructive in this case.  First, in *State v. Goldsberry*, the Court reasoned that while "[t]he statute is silent as to the length of time the State may hold

---

[65] *See id.*; *see also State v. Goldsberry*, 2000 WL 710090, at *2 (Del. Super. Apr. 26, 2000) ("Eleven *Del. C.* § 404(a) states that a court may order a defendant confined at the DPC until he is able to stand trial. The statute is silent as to the length of time the State may hold an incompetent defendant." (internal citation omitted)); *Hampton v. State*, 2000 WL 33115720, at *1 (Del. Super. Sept. 29, 2000) ("The statute does not provide for any scenario that ever results in the defendant being released if the State meets its burden and if he never becomes competent to stand trial.").

[66] 11 *Del. C.* § 403(b) (emphasis supplied).  While § 403(a) refers to defendants who are confined after being found not guilty by reason of insanity, §403(b) applies to individuals confined at DPC "in accordance with subsection (a) of this section, **§ 404**, § 405, § 406 or § 408 of this title." *Id.* (emphasis supplied).

[67] *Id.*

16

an incompetent defendant[,] . . . surely such silence was not intended by the Legislature as bestowing authority on the State to hold an unconvicted criminal defendant in an institution for what could amount to be a life sentence."[68]  After discussing the requirements of *Jackson*, *Goldsberry* effectively read that case's test into § 404(a), and held that the statute "does not permit an incompetent criminal defendant to be held indefinitely while awaiting a return to competency"—rather, an incompetent defendant may be held only for "a reasonable period of time necessary to determine whether there is a substantial probability that [the defendant] will attain the capacity to stand trial in the foreseeable future."[69]  On the facts before it, however, the Court concluded that the defendant still might be restored to competency and that a reasonable period of time had not yet elapsed.[70]  Nonetheless, the Court warned that "[t]he day may come . . . when the State will have to choose between a civil commitment or release."[71]

However, in *Hampton v. State*, the Superior Court dealt with a case in which a defendant was considered by medical experts to be "irreversibly incompetent."[72] Relying on *Jackson v. Indiana*, the defendant sought a writ of habeas corpus.  The Court in *Hampton* distinguished *Jackson*, noting that "[t]he Delaware statute contains a procedural step not contained in the Illinois statute involved in *Jackson*"—the requirement of a prima facie hearing.[73]  Since the defendant had not yet moved for a prima facie hearing, the Court concluded that "it is not at all legally clear at this point that the defendant's commitment is indefinite."[74]  The Court thus declined to pass on his constitutional claims, noting that they would only

---

[68] *Goldsberry*, 2000 WL 710090, at *2.
[69] *Id.* at *3.
[70] *Id.*
[71] *Id.*
[72] *Hampton*, 2000 WL 33115720, at *1.
[73] *Id.* at *2.
[74] *Id.*

17

"become ripe for adjudication" after a prima facie hearing was held and the State presented sufficient evidence to justify continued detention.[75]

### c. Mr. Topolski's Due Process Claim

The Supreme Court explained in *Jackson* that "due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed."[76] More specifically, when an individual's commitment is "solely on account of his incapacity to proceed to trial," he or she "cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future."[77]

As a factual matter, the Court finds that there is not a substantial probability that Mr. Topolski will attain competency in the foreseeable future, and a reasonable period of time to so determine has expired. This conclusion is bolstered by multiple DPC reports with increasingly dire prognoses for Mr. Topolski's restoration to competency (summarized above), the failure of a partial course of ECT treatments to lead to any observable improvement, and the expert opinions of Dr. Roberts and Dr. Donohue, which this Court has no reason to doubt, that it is highly unlikely that Mr. Topolski will *ever* be restored to competency, much less restored in the foreseeable future. Thus, he can no longer be held solely on the basis of his criminal charges, and incompetency to be tried for them, consistent with the Due Process Clause.[78]

---

[75] *Id.* The Court takes judicial notice of the docket and case file in *Hampton*, pursuant to Delaware Rule of Evidence 202(d)(1)(C), which allows the Court to take judicial notice of, *inter alia*, "the records of the court in which the action is pending . . . ." In *Hampton*, a prima facie hearing was later held upon defendant's motion, and the State presented evidence sufficient to establish a prima facie case to continue detention. However, the docket does not indicate that a follow-up motion renewing the defendant's constitutional challenges was ever filed.

[76] *Jackson*, 406 U.S. at 738.

[77] *Id.*

[78] *Id.*; *Goldsberry*, 2000 WL 710090, at *3.

This finding does not, however, necessarily end the inquiry. The Supreme Court in *Jackson* distinguished prior federal court case law in which incompetent defendants were detained based on their incompetency to stand trial *and* a finding of dangerousness.[79] In explaining the standard for commitment under the federal statute governing incompetency, the Supreme Court wrote that "*[w]ithout a finding of dangerousness*, one committed thereunder can be held only for a 'reasonable period of time' necessary to determine whether there is a substantial chance of his attaining the capacity to stand trial in the foreseeable future."[80]

As explained above, 11 *Del. C.* § 403(b) requires that a person committed to the DPC pursuant to § 404 "shall be kept there at all times in a secured building until the Superior Court of the county wherein the case would be tried or was tried is satisfied that the public safety will not be endangered by the patient's release." Thus, in light of § 403(b), indefinite detention at the DPC is only authorized under Delaware law so long as the defendant would be dangerous to the public if released (unlike the Indiana statute at issue in *Jackson*). Since no Delaware court has yet to consider the operation of § 403(b) with respect to incompetent defendants in light of *Jackson*, and it was not addressed in the briefing, the Court requires supplemental briefing on the issue. Accordingly, the Court will order supplemental briefing from the parties on 1) what is required procedurally under 11 *Del. C.* § 403(b) to justify an incompetent defendant's continued detention and 2) whether those safeguards are sufficient to satisfy the Due Process Clause, specifically, whether the "nature and

---

[79] *Jackson*, 406 U.S. at 731 ("In the federal criminal system, the constitutional issue posed here has not been encountered precisely because the federal statutes have been construed to require that a mentally incompetent defendant must also be found 'dangerous' before he can be committed indefinitely.").

[80] *Id.* at 733 (emphasis supplied).

duration of commitment" authorized by Delaware law "bear[s] some reasonable relation to the purpose for which the individual is committed."[81]

### d. Mr. Topolski's Equal Protection Claim

The Equal Protection Clause does not prohibit legislative classifications between similarly situated groups of people, but it does require, at a minimum, that such differential treatment must "bear[] a rational relation to some legitimate end."[82] Unless a suspect classification or fundamental right is implicated, the party challenging differential treatment under the Equal Protection Clause bears a heavy "burden of showing a lack of rational justification for the classification created by the statute."[83] Here, Mr. Topolski argues that his continued detention under 11 *Del. C.* § 404(a) violates his rights under the Equal Protection Clause because he is being held in effect indefinitely at the DPC without the same procedural protections that would be available to Delawareans subject to an involuntary civil commitment.

Mr. Topolski's position is supported by *Jackson*, which does not explicitly invoke the language of rational basis review. However, since incompetent criminal defendants have never been identified as a suspect class under equal protection jurisprudence, the Court concludes that a challenge to their differential treatment calls for rational basis review.[84] Thus, in order to be held unconstitutional, "the distinction must be patently arbitrary and bear no rational relationship to a legitimate

---

[81] *Jackson*, 406 U.S. at 731.

[82] *Romer v. Evans*, 517 U.S. 620, 631 (1996); *see also Helman v. State*, 784 A.2d 1058, 1074 (Del. 2001) ("Under the Fourteenth amendment, where a fundamental right or a suspect class is not implicated, a classification will be upheld if it is demonstrated that it is rationally related to a legitimate government interest.").

[83] *Helman*, 784 A.2d at 1074–75.

[84] *See State v. Witherup*, 1996 WL 527284, at *1 (Del. Super. July 3, 1996) ("Equal protection is satisfied where, in the absence of a fundamental right or suspect classification, the statutory distinction is rationally related to a legitimate legislative objective."); *cf. Matter of Lewis*, 403 A.2d 1115, 1119 (Del. 1979) (applying rational basis review to a challenge to the indefinite detention of people found not guilty by reason of insanity).

20

governmental interest."[85]  As in *Jackson*, the first step in the equal protection analysis here is to identify how the standards of commitment and release for incompetent criminal defendants differ from those applicable to similarly situated members of the general public.  Only then can the Court determine whether those differences survive rational basis review.

In order to commit an individual involuntarily to inpatient treatment, the State typically must meet the requirements of 16 *Del. C.* § 5011, Delaware's involuntary civil commitment statute.  Specifically, the State must show by clear and convincing evidence that 1) the person has a mental condition; 2) the person is, "[b]ased upon manifest indications," dangerous to himself or to others; 3) all less restrictive alternatives have been considered and "determined to be clinically inappropriate"; and 4) the person has either declined voluntary inpatient treatment or lacks capacity to consent to inpatient treatment.[86]  By contrast, all that is required for commitment under 11 *Del. C.* § 404(a) is that 1) the person be charged with a crime; 2) the State *fails* to prove by a preponderance of the evidence that the person is competent to stand trial;[87] and 3) the State presents a prima facie case that the defendant is guilty of the crime charged.  Moreover, unlike the indefinite nature of commitment under § 404, continued civil commitment under 16 *Del. C.* § 5011 requires a new hearing every three months "to review whether continued involuntary inpatient treatment is necessary."[88]

Applying the rational basis standard in a related context, the Delaware Supreme Court has held that involuntary commitment of insanity acquittees (i.e.,

---

[85] *Sisson v. State*, 903 A.2d 288, 314 (Del. 2006) (quoting *Hughes v. State,* 653 A.2d 241, 248 (Del. 1994)).

[86] 16 *Del. C.* § 5011(a).

[87] *See Smith v. State*, 918 A.2d 1144, 1148 (Del. 2007) ("The prosecution bears the burden of proving a defendant's legal competency by a preponderance of the evidence.").

[88] 16 *Del. C.* § 5011(d).

people acquitted by a finding of not guilty by reason of insanity) pursuant to 11 *Del. C.* § 403(a) and (b), without going through the civil commitment process applicable to other citizens, does not violate the Equal Protection Clause. First, the Delaware Supreme Court observed that "insanity acquitees [sic] constitute an 'exceptional class' because 'they have already endangered the public safety . . . as a result of their mental conditions as distinguished from people civilly committed because of only potential danger.'"[89] The past conduct of insanity acquittees sets them apart from "mentally ill person[s]" subject to civil commitment because "insanity acquitees [sic] have performed acts which, but for the existence of a mental disease or defect that the time of the acts [sic], would otherwise have subjected them to criminal sanctions."[90] Moreover, "[u]nlike the involuntary civil committee who generally denies the existence of the mental condition for which he is committed, the insanity acquitee [sic] has been provided a judicial hearing at which he has alleged and proven by a preponderance of the evidence the very mental condition which he has manifested in past criminal action and for which, by reason of the presumption of continuing mental illness, he is committed."[91] This, the Delaware Supreme Court concluded, "provides a rational basis for the insanity acquitee's [sic] immediate commitment."[92]

Against this backdrop, this Court must decide whether continued detention of Mr. Topolski, without the benefit of the civil commitment procedures set forth in 16 *Del. C.* § 5011, bears a rational relationship to a legitimate government interest. Mr. Topolski is similarly situated to the defendant in *Jackson*, except that rather than the

---

[89] *Lewis*, 403 A.2d at 1118 (quoting *Chase v. Kearns*, 278 A.2d 132, 138 (Me. 1971)).

[90] *Id.*

[91] *Id.* at 1119.

[92] *Id.*; *see also Witherup*, 1996 WL 527284, at *2 (holding that requiring an insanity acquittee, rather than the State, to bear the burden of proof in a release hearing did not violate the Equal Protection Clause).

mere pendency of criminal charges, the State has made out a prima facie case against him. The State argues that Delaware's statutory requirement of a prima facie hearing sets it apart from the Indiana law at issue in *Jackson*—whereas Indiana law authorized indefinite commitment based solely on pending criminal charges and a finding of incompetency, the State asserts that Delaware law requires that the State "prove that it has a prosecutable criminal case in order to justify continued detention for treatment purposes."[93]

Here, as in *Lewis*, there is a legitimate government interest in protecting the public from the potential danger posed by someone who is both presently mentally ill and who the State has demonstrated, by way of a prima facie case, has likely already engaged in criminal conduct. However, the two cases differ in important respects. First, unlike an insanity acquittee, a defendant need not prove his or her own mental illness in order to be found incompetent. Rather, once competency is put in issue, the State must prove that the defendant *is* competent in order to proceed to trial. Second, there is not necessarily any connection between an incompetent defendant's alleged criminal conduct in the past and his or her present mental illness (the illness preventing the case from going to trial). In other words, a defendant's present mental illness may differ from his or her mental state at the time of the alleged offenses, and thus might not rationally support any inferences about the defendant's future dangerousness or propensity for criminal activity.

Moreover, Section 404(a) draws no distinction between relatively minor crimes, like those at issue in *Jackson*, and more serious offenses indicative of dangerousness, like those alleged in this case. For these reasons, the Court is not prepared to accept the State's assertion that the prima facie hearing alone supplies the necessary rational basis for bypassing ordinary civil commitment procedures that

---

[93] State's Resp. ¶ 19.

was lacking under the Indiana statutory scheme in *Jackson*.  However, as explained above, the release standard in 11 *Del. C.* § 403(b) more clearly implicates the legitimate government objective of protecting public safety.  As with Mr. Topolski's due process claim, the Court will require additional briefing on 11 *Del. C.* § 403(b) prior to ruling on the equal protection claim.

## CONCLUSION

For the foregoing reasons, Mr. Topolski's motion to dismiss on speedy trial grounds is **DENIED WITHOUT PREJUDICE**.  Decision on his motion for a writ of habeas corpus is **DEFERRED** pending supplemental briefing on the requirements of 11 *Del. C.* § 403(b) for continued detention, and whether indefinite detention under 11 *Del. C.* §§ 403(b) and 404(a) combined comports with the constitutional mandates of the Due Process and Equal Protection Clauses as construed in *Jackson v. Indiana*.  **Counsel are directed to file concurrent supplemental briefing no later than February 28, 2023, and shall have the opportunity to respond to one another's submissions no later than March 10, 2023.**

**IT IS SO ORDERED.**

_____

Noel Eason Primos, Judge

NEP/tls
*Via Email*
oc:  Prothonotary
cc:  Counsel of Record

24